## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                         )

**PROJECT ON GOVERNMENT**     )
**OVERSIGHT, INC.**           )
**1100 G St., NW**            )
**Suite 500**               )
**Washington, D.C. 20005,**   )
                        )
      **Plaintiff,**        )
                        )
**v.**                     )     **Case No: 20-01421**
                        )
**U.S. DEPARTMENT OF STATE** )
**The Executive Office**     )
**Office of the Legal Adviser**   )
**Suite 5.600**             )
**600 19th Street, NW**     )
**Washington, DC 20522**    )
                        )
      **Defendant.**       )
_____)

## COMPLAINT

This complaint for injunctive and other appropriate relief seeks the immediate release of records requested by the plaintiff Project On Government Oversight ("POGO") and from defendant, U.S. Department of State ("State"), pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.

## I.      INTRODUCTION

1. POGO asserts violations of FOIA by State for failing to respond to POGO's request.

2. POGO filed a request with State regarding this subject on April 26, 2017.

3. State acknowledged receipt of POGO's requests on April 27, 2017.

4. FOIA guidelines required State to respond within 20 business days, excluding Saturdays, Sundays, and legal holidays. To date, State has not produced any responsive documents.

5. POGO seeks a declaration that State violated FOIA by failing to disclose responsive records by the statutory deadline and an injunction ordering State to produce all non-exempt, responsive records by a date certain, without further delay.

## II.       JURISDICTION AND VENUE

6. This Court has both subject matter jurisdiction over the parties pursuant to 5 U.S.C. § 552(a)(4)(B). This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

7. Venue lies in this district under 5 U.S.C. § 552(a)(4)(B).

## III.       PARTIES

8. Plaintiff POGO is a nonpartisan independent organization based in Washington, DC organized under section 501(c)(3) of the Internal Revenue Code. Founded in 1981, POGO champions reforms to achieve a more effective, ethical, and accountable federal government that safeguards constitutional principles. POGO's investigators and journalists take leads and information from insiders and verify the information through investigations using FOIA, interviews, and other fact-finding strategies. POGO's investigative work has been recognized by Members of Congress, executive branch officials, and professional journalism organizations. For instance, in 2015, POGO won the Robert D.G. Lewis Watchdog Award, the Society of Professional Journalists Washington, D.C. Professional Chapter's highest journalistic award, for reporting on the Department of Justice's opaque system for handling allegations of attorney misconduct within its ranks. In 2018, POGO won an award from the Society for Advancing

Business Editing & Writing for its investigative series scrutinizing the government's oversight of offshore drilling. POGO extensively used records obtained under FOIA for this investigation.

9. State is a federal agency within the meaning of FOIA, 5 U.S.C. § 552(f). State has possession or control of the records POGO seeks in this action.

## IV.    FREEDOM OF INFORMATION ACT

10. FOIA requires federal agencies, upon request, to make records "promptly available" to the public. Id. § 552(a)(3)(A).

11. The agency must provide the public records when they are requested by the public, in order "to ensure an informed citizenry, vital to the functioning democratic society." *See LRB v. Robbins Tire & Rubber Co.,* 437 U.S. 214, 242 (1978).

12. An agency must determine whether to comply with a FOIA request within twenty business days and "shall immediately notify the person making such request of such determination and the reasons therefor." Id. § 552(a)(6)(A)(i); see also 15 C.F.R. § 4.6(b).

13. The twenty-day deadline for an agency to determine whether to comply with a request begins on the date "the request is first received by the appropriate component of the agency" but no later than "ten days after the request is "first received by any component of the agency that is designated in the agency's regulations . . . to receive [FOIA] requests." 5 U.S.C. § 552(a)(6)(A)(i)-(a)(6)(A)(ii).

14.  In unusual circumstances, the time limits prescribed may be extended by written notice to the person making such request setting forth the reasons for such extension and the date on which a determination is expected to be dispatched. No such notice shall specify a date that would result in an extension for more than ten working days. 5 U.S.C. § 552(a)(6)(B).

15. If an agency does not respond to a FOIA request by the statutory deadline, the requester is deemed to have exhausted administrative remedies and may immediately pursue judicial review. Id. §§ 552(a)(6)(C)(i), 552(a)(4)(B).

## V.      BACKGROUND AND PUBLIC INTEREST IN THE RECORDS SOUGHT

### i.      United States Department of State

16. State was established under 22 U.S.C. § 2651.

17. Originally known as the Department of Foreign Affairs when it was created in 1789, State is the oldest of the cabinet-level agencies in the Executive Branch.

18. State is responsible for handling the foreign affairs of the United States government and consists largely of diplomats and Foreign Service officers who carry out American foreign policy throughout the world. In carrying out its duties, State:

    a.  Serves as the President's principal adviser on U.S. foreign policy;
    b.  Conducts negotiations relating to U.S. foreign affairs;
    c.  Grants and issues passports to American citizens and exequaturs to foreign consuls in the United States;
    d.  Advises the President on the appointment of U.S. ambassadors, ministers, consuls, and other diplomatic representatives;
    e.  Advises the President regarding the acceptance, recall, and dismissal of the representatives of foreign governments;
    f.  Personally participates in or directs U.S. representatives to international conferences, organizations, and agencies;
    g.  Negotiates, interprets, and terminates treaties and agreements;
    h.  Ensures the protection of the U.S. Government to American citizens, property, and interests in foreign countries;
    i.  Supervises the administration of U.S. immigration laws abroad;
    j.  Provides information to American citizens regarding the political, economic, social, cultural, and humanitarian conditions in foreign countries;
    k.  Informs the Congress and American citizens on the conduct of U.S. foreign relations;
    l.  Promotes beneficial economic intercourse between the United States and other countries;
    m.  Administers the Department of State;
    n.  Supervises the Foreign Service of the United States.

*See* Duties of the Secretary of State, attached hereto as Exhibit A, at pp. 1-2.

### ii.     The Emoluments Clauses

19. An emolument is generally an advantage, profit, gain, or benefit offered to an official in office that could influence that federal officer. *See* November 5, 2019 CRS Report, attached hereto as Exhibit B, at pp. 8-9.

20. The founders were concerned enough about foreign influence to include emoluments protections.

21. In his farewell address, President George Washington warned of the dangers of foreign influence and that foreign alliances should be temporary and equally beneficial between nations and not individual gains. U.S. citizens should not be indebted to or prioritize the interests of America over any other foreign interest:

> The disorders and miseries which result gradually incline the minds of men to seek security and repose in the absolute power of an individual; and sooner or later the chief of some prevailing faction, more able or more fortunate than his competitors, turns this disposition to the purposes of his own elevation, on the ruins of public liberty… It serves always to distract the public councils and enfeeble the public administration. It agitates the community with ill-founded jealousies and false alarms, kindles the animosity of one part against another, foments occasionally riot and insurrection. It opens the door to foreign influence and corruption, which finds a facilitated access to the government itself through the channels of party passions. Thus the policy and the will of one country are subjected to the policy and will of another.

*See* Transcript of President George Washington's 1796 Farewell Address, attached hereto as Exhibit J, at p. 4.

22. More specifically, President Washington cautioned citizens against pursuing gains through foreign influence:

> Harmony, liberal intercourse with all nations, are recommended by policy, humanity, and interest. But even our commercial policy should hold an equal and impartial hand; neither seeking nor granting exclusive favors or preferences; consulting the natural

course of things; diffusing and diversifying by gentle means the streams of commerce, but forcing nothing; establishing (with powers so disposed, in order to give trade a stable course, to define the rights of our merchants, and to enable the government to support them) conventional rules of intercourse, the best that present circumstances and mutual opinion will permit, but temporary, and liable to be from time to time abandoned or varied, as experience and circumstances shall dictate; constantly keeping in view that it is folly in one nation to look for disinterested favors from another; that it must pay with a portion of its independence for whatever it may accept under that character; that, by such acceptance, it may place itself in the condition of having given equivalents for nominal favors, and yet of being reproached with ingratitude for not giving more. There can be no greater error than to expect or calculate upon real favors from nation to nation. It is an illusion, which experience must cure, which a just pride ought to discard.

Exhibit J, p. 6.

23. The Foreign Emoluments clause states, "[n]o title of nobility shall be granted by the United States: and no person holding any office of profit or trust under them, shall, without the consent of the Congress, accept of any present, emolument, office, or title, of any kind whatever, from any king, prince, or foreign state." *See* U.S. Const. art. I, § 9, cl. 8.

24. The purpose of the Foreign Emoluments Clause is to prevent corruption and limit foreign influence on federal officers. Exhibit B, p. i.

25. This clause applies to "all federal employees, including full-time, part-time, and 'special federal employees'" as well as "…regular and reserve members of the uniformed services, without regard to whether they are on active duty, and thus it applies to military retirees for life and to reservists even when they are not on active duty." *See* May 2017 Law Review, attached hereto as Exhibit M, at p. 1

26. The Domestic Emoluments Clause states, "[t]he President shall, at stated Times, receive for his Services, a Compensation, which shall neither be [i]ncreased nor diminished during the Period for which he shall have been elected, and he shall not receive within that

Period any other Emolument from the United States, or any of them." *See* U.S. Const. art. II, § 1, cl. 7.

27. "The purpose of the Domestic Emoluments Clause is to preserve the President's independence by preventing the legislature and the states from exerting influence over him 'by appealing to his avarice.'" Exhibit B, p. i.

### iii.    37 U.S.C. § 908

28. Retired military personnel, (regular or reserve) are barred from receiving fees, gifts, salaries, etc. from foreign governments by the Emoluments Clause without prior Congressional approval. *See* OSD OGC Memorandum, attached hereto as Exhibit C, at p. 1.

29. "Consent is provided by Congress in 37 U.S.C. § 908, which requires advance approval from the relevant Service Secretary and the Secretary of State before accepting employment, consulting fees, gifts, travel expenses, honoraria or salary from a foreign government." *Id.*[1]

30. This statute states:

> Subject to subsection (b), Congress consents to the following persons accepting civil employment (and compensation for that employment) for which the consent of Congress is required by the last paragraph of section 9 of article I of the Constitution, related to acceptance of emoluments, offices, or titles from a foreign government:
>
> 1)  Retired members of the uniformed services.
> 2)  Members of a reserve component of the armed forces.
> 3)  Members of the Commissioned Reserve Corps of the Public Health Service.

---

[1]     Retired military members are allowed to "accept employment by, or [hold] an office or position in, the military forces of a newly democratic nation; and…[accept] compensation associated with such employment, office of position[,]" provided they receive Congressional consent. 10 U.S.C. § 1060.

37 U.S.C. § 908(a); and

> Not later than January 31 each year, the Secretaries of the military departments, after consulting with the Secretary of State, shall jointly submit to the Committees on Armed Services of the Senate and House of Representatives a report on each approval under subsection (b) for employment or compensation described in subsection (a) for a retired member of the armed forces in general or flag officer grade that was issued during the preceding year.

37 U.S.C. § 908(c).

31. Violations of 37 U.S.C. § 908 can result in disciplinary action against retired military as well.

32. In March of 1986, the Comptroller General of the United States found that a retired member of the U.S. Marine Corps who went on the serve as an instructor for the Royal Saudi Navy, was in violation of 37 U.S.C. § 908 and therefore withheld his military retired pay. *See* Hartnett Decision, attached hereto as Exhibit D, at p. 1.

33. However, those who seek and obtain permission pursuant to 37 U.S.C. § 908, are allowed to obtain compensation for work, without penalty.

### iv.     Congressional Interest

34. In 2019, he House of Representatives voted for an amendment to the National Defense Authorization Act of Fiscal Year 2020 ("NDAA 20") which would, "shine a light on when retired general or flag officers receive compensation from foreign governments through annual reporting to the public." *See* July 11, 2019 POGO press release, attached hereto as Exhibit K, at p. 1.[2]

---

[2]     Senators Richard Blumenthal and Jeanne Shaheen asked for an investigation of retired United States Army Lieutenant General and former National Security Advisor, Michael Flynn's compliance with this requirement, given his "record of mishandling classified intelligence and repeatedly [having] violated rules for protecting sensitive information." *See* December 9, 2016 Senate letter re: Michael Flynn, attached hereto as Exhibit O, at p. 1.

35. The amendment's sponsor, Rep. Pramila Jayapal (D-WA), described it as a method to, "help the American public understand how foreign governments are compensating former military officials to potentially drive their lobbying agenda." *Id.*, p.2.

36. The NDAA 20 also, "[r]equires the Secretary of Defense to enhance the assessment and mitigation of risks related to foreign ownership, control, or influence within the defense industrial base." *See* Senate Armed Service Committee's NDAA 20 Executive Summary, attached here to as Exhibit L, at p. 6.

37. Additionally, it "[s]ets up processes to gain insight to foreign ownership, control of and influence over defense contractors, and expands elements under Never Contract With the Enemy.[3]" Exhibit L, p. 15.

### v.       Public Interest

38. POGO has had a long standing interest in shedding light on the potential conflict that may arise when "[h]igh-ranking military officers are regularly called by the Department and Congress to provide advice on national security issues with the assumption that their sole loyalty is to the interests of the United States." See August 2, 2017 POGO article, *Generally Concerning*, attached hereto as Exhibit F, at p. 2.

39. Furthermore, "[i]t should be clear to policymakers and the public if their advice may be influenced because they are receiving money from or have previous professional relationships with foreign governments." *Id*.

---

[3]      The Never Contract with the Enemy Act provides federal agencies with streamlined procedures for stopping money from federal contracts, grants and cooperative agreements from going to people and entities who actively oppose U.S. forces engaged in hostilities. *See* Senate Report No. 113-216 (2014).

40. Absent voluntary public disclosure,  "it can be difficult to know if retired Pentagon officials and officers working for foreign governments while simultaneously providing advice and testimony to the U.S. government may have possible conflicts." See November 5, 2018 POGO article, Brass Parachutes excerpt at p. 2, attached hereto as Exhibit P.

41. "Under House Rules, Congressional witnesses must disclose any federal contracts or payments they received from foreign governments that are relevant to the subject of the hearing at which they're testifying[, yet, there] isn't any requirement to disclose whether a witness is negotiating employment with a foreign government." *Id.*

42. Current laws require public disclosure for foreign lobbying activities under the Foreign Agents Registration Act ("FARA"), that require "anyone who lobbies on behalf of foreign governments and political parties must register their activities with the Department of Justice and submit regular documentation describing their activities." Exhibit F, p. 5.

43. However, there is no such reporting requirement for "monitoring how retired military officers work for foreign governments." *Id.*

44. Documents obtained by POGO through a FOIA request for the names of any officers who were granted approval under 37 U.S.C. § 908 from January 2000 to April 2017 showed former Secretary of Defense James Mattis, former White House Chief of Staff John Kelly, former National Security Advisor to President Obama retired General James L. Jones, and former Marine Corps Commandant General James Amos all sought and received permission from the Marine Corps.[4] *See* 2017 POGO FOIA Request, attached hereto as Exhibit E, at p. 3.

---

[4]      POGO also received similar records from the Army which indicated a number of retired officers who sought permission to gain employment from the UAE military. Exhibit P, p. 2.

45. Given the high-level and classified information these individuals had access too, it is of extreme importance to the general public, where and with whom they are working with after leaving the employ of the US government for foreign governments.

46. However, the list POGO received through its 2017 request, shows other officers who have been granted permission, but is heavily redacted pursuant to Exemption (b)(6). [5] Exhibit E, p. 3. Because of these redactions, the public has no way of knowing what information these individuals have access too and who may be exerting influence over them for it.

47. Exemption (b)(6) prohibits disclosure of personal information when an individual's privacy interest in it outweighs any public interest, however, if the public interest outweighs those privacy concerns, agencies, including State, can disclose that information. Exhibit F, p. 5.

48. If retired military officers are on the payroll of foreign governments, that is information policymakers and the public should know in order to assess whether their advice is in the national public interest.

49. The information currently being withheld by State will convey to the public how the government interprets and applies the founders' concerns about the efforts of foreign governments to pressure the U.S. into wars and other foreign policy decisions that might compromise domestic safety and security.

50. Moreover, they are the first step in creating policy that will allow for greater government transparency.

---

5       Exemption (b)(6) applies to personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy. 5 U.S.C. § 552(b)(6). *See* DOJ's FOIA Guide, 2004 Edition: Exemption 6 excerpt, attached hereto as Exhibit N

## VI.     PLAINTIFF'S FREEDOM OF INFORMATION ACT REQUEST

51. On April 26, 2017, POGO employee Mandy Smithberger submitted an online FOIA request to State which requested, "records that are maintained by an agency or for an agency by a government contractor in any format, including an electronic format for any approvals issued by the U.S. Department of State as authorized by 37 USC § 908." ("Request"). *See* April 27, 2017 Acknowledgment letter, Attached hereto as Exhibit G, at p. 1."

52. POGO received an acknowledgment letter dated April 27, 2017 for the Request and it was assigned the reference number F-2017-10808. *Id.*

53. Although POGO's request for expedited processing was denied by State, the letter stated that the agency would "make every effort to process your request in as timely a manner as possible." *Id.*

54. State granted POGO's request for a fee waiver.

55. On May 31, 2017, Ms. Smithberger emailed State to check the status of the Request and the same day received a response stating "that the estimated date of completion for this case [was] November 30, 2017. *See* State Department emails, attached hereto as Exhibit H, at p. 1.

56. POGO received no correspondence from State between May 31, 2017 and November 30, 2017.

57. On November 30, 2017, Ms. Smithberger requested a revised estimated completion date.  Exhibit H, p. 3

58. That same day, instead of providing an estimated completion date, State replied by stating that there was a "backlog of approximately 11,600 cases" and that "there could be delays in processing [the Request]." Exhibit H, p. 4.

59. Ms. Smithberger and State once again exchanged emails on February 21, 2018:

> The Department currently has a backlog of approximately 10,600 cases. The Department is taking significant steps to improve its responsiveness to the public and has undertaken a Freedom of Information Act (FOIA) surge project to reduce the backlog in the coming months. In order to further the core FOIA goals of transparency and accountability, the State Department is committing more resources and personnel to clear the backlog of requests, while still maintaining the highest standards of quality.

Exhibit H, pp. 4-5.

60.  In late October 2018, Ms. Smithberger emailed State requesting a status update and received a reply which stated the Request "continues to be processed[,]" and that POGO would "be notified of [State]'s search and review effort…as soon as it becomes available." Exhibit H, pp. 5-6.

61.  After receiving no such update, Ms. Smithberger emailed State on February 13, 2019 seeing the status of the Request. Exhibit H, pp. 6-7.

62.  State replied to Ms. Smithberger on March 6, 2019. In that response, State wrote that the backlog was now at 11,000 cases. Exhibit H, p. 7.

63.  On January 15, 2020, POGO employee, Lance Sims, called State to request an update on the status of the request and was told that the Request was still processing and that State would email Ms. Smithberger and him when an estimated date of completion could be provided.

64.  On January 17, State emailed Ms. Smithberger and Mr. Sims with a new estimated date of completion of November 12, 2021. *See* January 2020 State email, attached hereto as Exhibit I.[6]

65.  To date, POGO has received no documents responsive to Request 1.[7]

---

[6]       On January 24, 2020, State sent an email to Ms. Smithberger which reiterated the November 21, 2021 estimated completion date. Exhibit H, pp. 8-9.

[7]       FOIA allows the Agency 20 business days to respond to POGO's request. State requested and additional 10 days to respond and has failed to do so.

66. State's most recent estimated completion date is more than four and a half years beyond the original request and acknowledgment dates.

67. Plaintiff POGO has a statutory right to the requested records, and there is no legal basis for State's failure to disclose them.

## VII.   CAUSES OF ACTION

### COUNT 1
**Violation of the FOIA for Failure to make Promptly
Available the Records Sought by Plaintiff's Requests**

68. Paragraphs 1-67 are realleged and reincorporated herein by reference.

69. Defendant's failure to make promptly available the records sought by plaintiff's requests violates the FOIA, 5 U.S.C. § 522(a)(3)(A).

### COUNT 2
**Violation of the FOIA for Failure to Timely Respond to Plaintiff's Requests**

70. Paragraphs 1-69 are realleged and reincorporated herein by reference.

71. Defendant's failure timely to respond to plaintiffs' request violates the FOIA, 5 U.S.C. § 552(a)(6)(A)(i), and DOJ's own regulation promulgated thereunder, 28 C.F.R. § 16.6(b).

## VIII.   PRAYER FOR RELIEF

**WHEREFORE,** plaintiff , POGO, prays for the following relief:

a. As to Count 1:
    i. Order defendant to immediately State which records it intends to disclose in response to plaintiff's FOIA requests;
    ii. Order defendant to provide a schedule of production to plaintiff;
    iii. Order defendant to disclose all responsive, non-exempt records by a date certain without further delay;
    iv. Order defendant to disclose a log identifying any document or parts thereof that it withholds and the basis for the withholding;
    v. Award plaintiff its costs and reasonable attorney's fees incurred in this action; and
    vi. Grant such other relief as the Court may deem just and proper.

    b.  As to Count 2:

        i.  Order defendant to immediately State which records it intends to disclose in response to plaintiff's FOIA requests;

       ii.  Order defendant to provide a schedule of production to plaintiff;

      iii.  Order defendant to disclose all responsive, non-exempt records by a date certain without further delay;

      iv.  Order defendant to disclose a log identifying any document or parts thereof that it withholds and the basis for the withholding;

       v.  Award plaintiff its costs and reasonable attorney's fees incurred in this action; and

      vi.  Grant such other relief as the Court may deem just and proper.

Respectfully submitted this 28th day of May, 2020.

By:      __/s/Ross A. Nabatoff_____
           Ross A. Nabatoff, DC Bar # 376665
           LAW OFFICE OF ROSS A. NABATOFF
           1440 G Street, N.W.
           Washington, D.C.  20005
           ross@ranlawfirm.com
           (202) 650-0037
           *Attorney for Plaintiff*